Kern, J.
Plaintiff, Aktina I. Daigle (“Daigle”), brought six statutory and common law claims against her former employer, New England Circuit Sales, d/b/a NECX, Inc. (“NECX”)[2] and her former supervisors, the individual defendants (“Cavallaro,” “Corbett” and “Whelan”) for sex discrimination, sexual harassment, hostile work environment, retaliation in violation of G.L.c. 15 IB, violation of the Massachusetts Civil Rights Act §111 (“MCRA”), and negligent and intentional infliction of emotional distress. Defendants NECX, Cavallaro and Corbett have now filed a Motion to Dismiss.[3] NECX has filed a Motion to Dismiss as to Counts II-VI. Cavallaro and Corbett have filed a Motion to Dismiss all counts against them. For the following reasons, the defendants’ Motion to Dismiss is ALLOWED.

BACKGROUND

All allegations in the complaint are taken as true for the purposes of this motion. The facts set forth in the complaint are as follows: On or about November 1995, NECX hired Daigle and she entered their training program where she received training in motivation, communication and sales skills. During the training, plaintiff alleges that women were targeted for positions as commission buyers whereas men were targeted for *463 positions as commission sellers.[4] Daigle’s first position was in a group headed by Whelan called the Broker-Sales Group or the Distribution Sales Group. On occasion Whelan would refer to people other than the plaintiff as “the chink motherfuckers” and “the kraut bastards.” Further, he referred to one employee he liked as “the Golden Greek” and to another employee as “the sand nigger.” Whelan would also refer to women as “beavers.” Whelan referred to Daigle in a loud and derogatory tone as “Curly.”
In Februaiy of 1996, Whelan grabbed the plaintiffs arm in front of a group of people and said, “Now Tina, it’s great that you are so enthusiastic, but you must slow down and learn.” Whelan then stated in a condescending manner, “Why would a customer buy from NECX?” He then took out a manila folder so others could see it and wrote the words, “N-E-E-D" and “P-R-I-C-E.” Whelan stated again in a loud voice, “Tina rushes around but doesn’t know anything.” After this incident people who worked with Daigle would tell her to slow down. Whelan also would make comments such as “you girls are too emotional” and “you girls have got to slow down.”[5] Despite these comments, plaintiff performed her job and generated customer lists for the company after being told hot to generate customer lists for herself.
Without notice, Daigle was transferred to the Inbound Acquisition Group (“IA Group”) which was headed by Joseph Corbett.[6] Plaintiffs job was to develop “house accounts” where commission went to NECX. Men were given the most active accounts, and after the “three men” achieved some success they were transferred to other departments and retained the accounts they had generated. Plaintiff and other women in the IA Group were not able to move to other departments or keep the accounts as their own. After making a profit of $9,000, Whelan, who was no longer plaintiffs direct supervisor yelled across the room, “Look at Tina’s gross profit, she lucked out.” After requesting a move into another group where she could develop her own accounts, Daigle was told “You girls just don’t have the skill set to go out and make commissions” and that there would be no more openings in the group. Two men were placed in the group shortly thereafter.
Plaintiff asked to be transferred to the Original Equipment Group (“OEM Group”), but was told that there were no openings, or that she was not ready. On or about May 2, 1996, Daigle was transferred into the OEM Group which was headed by Cavallaro. The group consisted of two women and fifteen men. Daigle’s desk was not physically in the same area as the other members of the group. Plaintiff requested her desk moved into that area, but her request was denied. Training in the OEM Group was informal and after the plaintiff requested formal training she was told just to “go for it.” Although Daigle reported to Cavallaro once a week, no other member of the group spoke to her for six weeks. After generating forty leads and upon review by Cavallaro, he gave three of her leads with an earning potential for the company of one million dollars to two different male employees. He said that “the more experienced guys” needed to handle the accounts and Daigle's job was to be in “lead generation.” Following the interaction, the plaintiff had no contact with anyone in the OEM group, including Cavallaro, for almost a month.
Daigle soon became stressed and was out sick for five days. She submitted a note from her doctor and was accused of forging the note. She was also told that an osteopath was not a real doctor. After a personal call from her doctor, the note was accepted. After discussion with others in the OEM Group the plaintiff realized that all new people had mentors. She complained to the Director of Personnel who responded that she was not doing well in the OEM Group and recommended that she speak with Cavallaro. Daigle attempted to speak with Cavallaro, but he responded that he was too busy. After several days, Daigle spoke with Paul Knight, another manager, who did not offer any advice except to say that she did not fit in the OEM Group. Thereafter, the plaintiff was transferred to the Computer Products Group which had five women and twenty-five men. Again, the plaintiff was given “house accounts” on which the company retained the commission with a portion going to her manager and none to her.- Daigle was then given a mentor, Kate Blanchard.
On or about August 10, 1996, an article appeared in the Boston Herald regarding a lawsuit filed by two women against NECX. The article was circulated in the office. Plaintiff was summoned to the personnel office and was told that an employee had informed them of her comments relating to the newspaper article. Daigle responded that she had also been the subject of disparate treatment. She had not been treated in the same fashion as the men. Plaintiff stated that she had been set up for failure and that she felt the company was like a fraternity rather than a workplace. She further said she had been a nervous wreck for months. Following the meeting, Blanchard informed the plaintiff that her name would be put on a bid deal that plaintiff had helped Blanchard in completing, and that Blanchard wanted to start tracking plaintiffs accounts. Plaintiff was upset and left the premises feeling ill.
Daigle consulted with a therapist who recommended that she take some time off. She was out of work for several days and was then informed that there was no short-term disability insurance. Feeling her health was in jeopardy and that there was no alternative, she left her position.

DISCUSSION

When evaluating the sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court must accept as true the well pleaded factual allegations of *464 the complaint, as well as any inference which can be drawn therefrom in the plaintiffs favor. Fairneny v. Savogran Co., 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1981), and cases cited. “(T]he complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).
“[A] complaint is not subject to dismissal if it would support relief on any theory of law.” Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). Further, a complaint should not be dismissed simply because it asserts a new or extreme theory of liability. New England Insulation Co. v. General Dynamics Corp., 26 Mass.App.Ct. 934, 934 (1988). All inferences should be drawn in the plaintiff s favor “so as to do substantial justice.” Ourfalian v. Aro Mfg. Co., Inc., 31 Mass.App.Ct. 294, 296 (1991).
A. Count I: Discrimination in Violation of M.G.L.c. 15IB
Both individual defendants contend that the court should grant their Motion to Dismiss Count I (“violation of c. 15 IB”) because the complaint fails to include any factual allegations against either defendant to support the claim. General Laws c. 15 IB, §4(5) states, “[It shall be an unlawful practice] for any person, whether an employer of employee or not, to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter . . . [E]mployers may be held liable for discriminating against individuals on the basis of sex in the terms, privileges, and conditions of their employment.” Plaintiff alleges that the individual defendants, as upper level management, had the authority and responsibility to make employment decisions and are required by law to maintain a working environment free from inequality. See Chapin v. University of Massachusetts at Lowell, 977 F.Sup. 72, 78-80 (D.Mass. 1997) (individual supervisor liable under §4(5) for failing to investigate individual complaints of harassment); College-Town of Interco v. MCAD, 400 Mass. 156 (1987).
Although supervisors may be held individually liable under the applicable statute, the plaintiff, nonetheless, has failed to set forth a sufficient factual basis to make out a claim for discrimination against either individual defendant. Plaintiff established that at one time each individual defendant was a supervisor of hers while she worked for NECX. However, there are no specific factual assertions that either defendant discriminated against the plaintiff nor that either aided or abetted any such conduct by others. Therefore, the individual defendants’ Motion to Dismiss Count I is ALLOWED.[7]
B. Count II: Sexual Harassment
All defendants move for dismissal on Count II which alleges sexual harassment. General Laws c. 15IB, §1(18) (1990 ed.) defines “sexual harassment” as “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests, or conduct have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.”
The MCAD enunciated the standard for sexual harassment in its decision in Ramsdell v. Western Mass. Bus Lines, 13 MDLR 1087 (1991). The commission stated, “to constitute sexual harassment, the conduct must be sufficiently pervasive and severe to alter the conditions of the victim’s employment and create an abusive working environment. Casual comments or accidental or sporadic conversation are insufficient to constitute a pervasive, hostile environment . . . The inquiry . . . [is] whether the conduct was repeated often enough to a point that it became ... a condition of the employment.” Id. at 1113-14. See also Ramsdell v. Western Massachusetts Bus Lines, Inc., 415 Mass. 673, 678-79 (1993) (employee must show “employer’s conduct was intentionally or in effect hostile, intimidating, or humiliating to the plaintiff in a way which affected her performance or the conditions of her employment”); College-Town, Division of Interco v. MCAD, 400 Mass. 156, 162 (1987); G.L.c. 151B, §1(18).
In determining whether the alleged conduct was “sufficiently severe and pervasive” the court must consider the conduct both objectively and subjectively. That is, “the court must determine whether, in the totality of the circumstances, the alleged [conduct] ‘would interfere with [a] hypothetical reasonable individual's work performance and affect seriously the psychological well-being of a reasonable person . . Lewis v. Gillette Company, 1993 WL 291771, at *6 (D.Mass 1993) (citations omitted). Although no particular number of incidents is required, it must be shown that the harassment was sufficiently pervasive to alter the conditions of employment. See Gnerre v. MCAD, 402 Mass. 502, 507-08 (1988). See also Morgan v. Massachusetts General Hospital, 901 F.2d 186, 192-93 (1st Cir. 1990) (allegations not actionable because not sufficiently pervasive and would not have affected a reasonable person’s work performance).
Here there is no allegation that submission to sexual requests was a condition of the plaintiff s employment. Thus, the facts alleged do not meet the quid pro quo standard of c. 151B §l(18)(a). Therefore, the court’s focus is on the definition under §l(18)(b). The only allegations that could be construed as having any sexual overtones are Whelan’s statements regarding *465 female body parts, his reference to women as “beavers," or, although more tenuous, his comment, “you girls are too emotional." Daigle does not allege when these statements took place, if the statements were directed toward her, or whether she even heard the statements or was told about them. Although sexist and offensive, these “sporadic” statements cannot demonstrate the level of pervasiveness and severity necessary to establish a claim for sexual harassment. See Lewis, supra, at *7 (“plaintiffs complaint of gawking and staring falls at the low end in comparison with the more typical harassment complaints of unwelcome sexual advances, bodily contact or racial epithets”); Ramsdell, supra, (holding that MCAD did not err in finding that where workplace is “rife with sexually explicit language and sexual innuendos,” and plaintiff herself admitted to participating in sexual jokes and using vulgar language, there was no credible evidence that the work environment in this situation was hostile, intimidating, or humiliating).
Plaintiff, based on the allegations in the complaint taken as admitted for purposes of a motion to dismiss, has failed to allege sufficient facts to establish a case for sexual harassment against either individual defendant or NECX. Therefore, the defendants’ Motion to Dismiss Count II is ALLOWED.

C. Count III: Retaliation

All defendants move to dismiss Count III which alleges retaliation. General Laws c. 151B, §4(4) states: “[It shall be unlawful] for any person, employer, labor organization or employment agency to discharge, expel, or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified, or assisted in any proceeding under Section five.”
To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in activity protected by c. 15 IB; (2) she suffered an adverse employment- action; and (3) a causal connection existed between the protected conduct and the adverse action. Connell v. Bank of Boston, 924 F. 2d 1169, 1179 (1st Cir.), cert. denied, 501 U.S. 1218 (1991). Harassment may constitute an “adverse employment action” in retaliation for participating in a protected activity. While retaliation typically takes the form of a discharge, a demotion, a transfer, or some similarly tangible change in employment responsibilities, employers are liable as well for more subtle actions taken in retaliation against their employees. See Lewis, supra, at *6.
Daigle cannot establish that she suffered an adverse employment action, given that the only fact alleged to have occurred after she was summoned into the personnel office, and presumably opposed the practices forbidden under chapter 15 IB, was that . . Kate Blanchard informed plaintiff that her name would be put on a bid deal.. . and that Ms. Blanchard wanted to start tracking [plaintiffs] accounts.” The fact that Daigle’s mentor stated that she would begin tracking plaintiffs accounts is not enough to establish that NECX intended to “discharge, expel, or otherwise discriminate” against plaintiff for her remarks regarding the Boston Herald article. Daigle had repeatedly requested a mentor to aid her in her job responsibilities. In addition, the fact that plaintiffs name was to be put on a bid deal could be viewed as a positive step, rather than retaliation. Indeed, the complaint itself states that, “after learning that [pjlaintiff had complaints about her treatment in the workplace, [djefendants attempted to quickly ameliorate nine months of discriminatory behavior.” For these reasons, defendants’ Motion to Dismiss Count III is ALLOWED.

D. Count IV: Massachusetts Civil Rights Act

All defendants move to dismiss Count- IV which alleges a violation of the Massachusetts Civil Rights Act. M.G.L.c. 15IB, §9 states in pertinent part, . . as to acts declared unlawful by Section four, the procedure provided in this chapter shall, while pending, be exclusive; and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the individual concerned.” The defendants maintain that this provision precludes plaintiff from bringing an action based on a violation of the MCRA, G.L.c. 12, §11H.[8] Plaintiff argues that she was constantly threatened with loss of her contract rights and that the harassment and discrimination she ensured, coupled with the retaliation by the defendants are all ways to substantiate a violation of the MCRA.
Daigle, however, is barred from claiming a violation of MCRA,[9] because of the exclusivity provision of c. 151B. See Charland v. Muzi Motors, Inc., 417 Mass. 580, 585 (1994), and Mouradian v. General Electric Co., 23 Mass.App.Ct. 538 (1987). The language of the most relevant case law as well as the language of Chapter 151B itself demonstrate that Chapter 151B, where applicable, provides an exclusive remedy, regardless of whether plaintiff satisfied that statute’s procedural requirements. See Green v. Wyman Gordon Co., 422 Mass. 551, 557 (1996); Agin v. Federal White Cement, Inc., 417 Mass. 669, 672 (1994). Accordingly, because G.L.c. 151B remedies are available to plaintiff, the exclusivity provision of that statute bars her Civil Rights Act claim. The defendants’ Motion to Dismiss Count IV is ALLOWED.

E. Counts V & VI: Negligent & Intentional Infliction of Emotional Distress

All defendants move for dismissal of Counts V & VI alleging negligent and intentional infliction of emotional distress because those claims are barred by the exclusivity provision of the Workers’ Compensation Act. See Green v. Wyman-Gordon Co., 422 Mass. 551, 558 (1996). See also Doe v. Purity Supreme, 422 Mass. 563 (1996). Common law claims are barred by the *466 exclusivity provision of the workers’ compensation act where “the plaintiff is shown to be an employee; his condition is shown to be a ‘personal injury’ within the meaning of the compensation act; and the injury is shown to have arisen ‘out of and in the course of . . . employment.’ ” Id. (citing Foley v. Polaroid Corp., 381 Mass. 545, 548-49 (1980), quoting G.L.c. 152, §26). This court concludes, as did the Court in Green and Doe that the claims for negligent and intentional infliction of emotional distress are barred by the exclusivity provision of the workers’ compensation act. Therefore, defendants’ Motion to Dismiss Counts V and VI is ALLOWED.

ORDER

For the foregoing reasons, NECX’s Motion to Dismiss Counts II-VI is ALLOWED and the Motion to Dismiss of Frank Cavallaro and Joseph Corbett is ALLOWED as to all counts.

 NECX is In the business of buying and selling electronic components, namely computer chips and other components.

 There has been no effective service on defendant Timothy Whelan as of the date of this filing, and therefore he is not considered a party to this action.

 Commissioned sales people earned between $60,000 and $80,000 per year, and commissioned buyers earned between $30,000 and $36,000 annually.

 When Whelan observed men getting excited about their work he would join in the excitement, even when they “yelled,” “swore” or “made wild comments."

 Plaintiff felt humiliated at the transfer because she was told that IA Group really meant “Incompetent Asshole” Group.

 NECX has not filed a Motion to Dismiss Count I against it.

 To establish a claim under the MCRA a plaintiff must show that (1) her exercise or enjoyment of rights secured by the Constitution of the United States or the Commonwealth (2) have been interfered with or attempted to be interfered with, and (3) that such interference or attempted interference was achieved by “threats, intimidation, or coercion.” G.L.c. 12, §11H.

 The court need not reach the issue as to whether the allegations rise to the level of such a violation.